IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


ANDRE MCKENZIE,
      Petitioner,

vs.                                  Case No. 4:06cv554/MMP/EMT

WALTER A. McNEIL,[1]
      Respondent.
_____/

## ORDER, REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's amended petition for writ of habeas corpus, filed under 28 U.S.C. § 2254, and supporting memorandum (Docs. 9, 10). Respondent filed an answer to the petition with relevant portions of the state court record, and Petitioner filed a reply (Docs. 18, 25).

The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N. D. Fla. Loc. R. 72.2(b). After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a). It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.      BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are undisputed and established by the state court record (*see* Doc. 18, Exhibits). Petitioner was indicted in the Circuit Court in and for Leon County, Florida, for one count of first degree murder (Doc. 18, Ex. B at 2–3). Following

---

[1]Walter A. McNeil succeeded James McDonough as Secretary for the Department of Corrections, and is automatically substituted as Respondent. *See* Fed. R. Civ. P. 25(d)(1).

a jury trial, Petitioner was found guilty as charged (Doc. 18, Ex. B at 44, Ex. C, Ex. D).  On October 7, 2003, Petitioner was adjudicated guilty and sentenced to life imprisonment, with pre-sentence jail credit of 181 days (Doc. 18, Ex. B at 53–61, Ex. E).

Petitioner appealed the judgment to the Florida First District Court of Appeal ("First DCA"). Petitioner's appellate counsel filed a brief, pursuant to Anders v. California, 386 U.S. 738 (1967), asserting that there were no meritorious arguments to support the contention that the trial court committed significant reversible error during Petitioner's trial (*see* Doc. 18, Ex. F).  The First DCA provided Petitioner an opportunity to file a pro se brief, but he declined to do so (*see* Doc. 18, Ex. G).  On February 23, 2005, the First DCA affirmed the judgment of conviction and sentence per curiam without written opinion, with the mandate issuing March 22, 2005 (Doc. 18, Exs. H, I). McKenzie v. State, 895 So. 2d 1070 (Fla. 1st DCA Feb. 23, 2005) (Table).  Petitioner did not seek certiorari review by the Florida Supreme Court or the United States Supreme Court.

On March 11, 2005, Petitioner filed a motion for postconviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Doc. 18, Ex. J at 88–109).  The trial court ordered an evidentiary hearing on all of Petitioner's claims and appointed counsel to represent him (*id.* at 126, 144).  An evidentiary hearing was held on October 14, 2005, and the court denied Petitioner's postconviction motion for the reasons stated on the record at the hearing (Doc. 18, Ex. J at 146, Ex. K).  Petitioner appealed the decision to the First DCA, and the appellate court affirmed per curiam without written opinion on June 21, 2007, with the mandate issuing July 7, 2006 (Doc. 18, Exs. N, O). McKenzie v. State, 931 So. 2d 906 (Fla. 1st DCA June 21, 2007) (Table).

Petitioner filed the instant habeas action on December 5, 2006 (Doc. 1 at 9).  Respondent concedes that the petition is timely (Doc. 18 at 5).

II.      STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States.  As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and

Effective Death Penalty Act of 1996 (AEDPA). Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19.

In relevant part, section 2254(d) now provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[2] The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

---

[2]Unless otherwise noted, references to <u>Williams</u> are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13). The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring); Ramdass v. Angelone, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000). In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case." Neelley v. Nagle, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by* Parker v. Head, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06). The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06). If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 409. Whether a State court's decision was an unreasonable application of legal principle must be assessed in light of the record the court had before it. Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683

(2004) (per curiam); *cf.* Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).  An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001).  The State court's incorrect or erroneous application of clearly established law will be held to be reasonable and not warrant a writ so long as the State court adjudication results in a "satisfactory conclusion." Williams, 529 U.S. at 410–12.

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see e.g.* Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact.").

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims.  *See* Panetti v. Quarterman, 551 U.S. 930, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d

662 (2007); <u>Jones</u>, 469 F.3d 1216 (same). The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

III.     EXHAUSTION AND DEFAULT

Section 2254(a) of Title 28 provides, "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws of the United States."

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, 28 U.S.C. § 2254(b)(1),[3] thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." <u>Duncan v. Henry</u>, 513 U.S. 364, 365, 115 S. Ct. 887, 888, 130 L. Ed. 2d 865 (1995) (quoting <u>Picard v. Connor</u>, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)). To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim. <u>Duncan</u>, 513 U.S. at 365–66; <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); <u>Picard</u>, 404 U.S. at 277–78.

The Supreme Court has offered the following guidance for determining whether a habeas petitioner has met the "fair presentation" requirement. In <u>Picard v. Connor</u>, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief. 404 U.S. at 277. In announcing that "the substance of a federal habeas corpus

---

[3]Section 2254 provides, in pertinent part:

(b)(1)     An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
        (A)  the applicant has exhausted the remedies available in the courts of the State; or
        (B) (i)  there is an absence of available State corrective process; or
           (ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c)  An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

claim must first be presented to the state courts," *id.* at 278, the Court rejected the contention that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is insufficient to make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court. In Anderson v. Harless, 459 U.S. 4, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982), the habeas petitioner was granted relief on the ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt. *Id.* at 7 (citing Sandstrom v. Montana, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)). The only manner in which the habeas petitioner cited federal authority was by referring to a state court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law." *Id.* (internal quotation marks omitted). The Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the cited case advanced a federal claim. *Id.* at 7 & n.3. Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought. *Id.*

Years later, the Supreme Court readdressed the "fair presentation" requirement in Duncan v. Henry, 513 U.S. 364 (1995). The Duncan Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the petitioner must raise his issue in terms of the applicable federal right in state court in order to obtain federal review of the issue.[4] The Supreme Court explained, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court." *Id.* at 365–66. Recently, the Supreme Court again focused upon the requirement of "fair

---

[4]The petitioner in Duncan raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal. Presented with a state constitutional claim, the state court applied state law in resolving the appeal.

presentation," holding that  "ordinarily a state prisoner does not 'fairly present' a claim to a state

court if that court must read beyond a petition or a brief (or a similar document) that does not alert

it to the presence of a federal claim in order to find material, such as a lower court opinion in the

case, that does so."  Baldwin v. Reese, 541 U.S. 27, 124 S. Ct. 1347, 1351, 158 L. Ed. 2d 64 (2004).

The Baldwin Court commented that "[a] litigant wishing to raise a federal issue can easily indicate

the federal law basis for his claim in a state court petition or brief, for example, by citing in

conjunction with the claim the federal source of law on which he relies or a case deciding such a

claim on federal grounds, or by simply labeling the claim 'federal.'"  Id., 541 U.S. at 32.  With

regard to this statement, the Eleventh Circuit stated in McNair v. Campbell, 416 F.3d 1291 (11th Cir.

2005):

> If read in a vacuum, this dicta might be thought to create a low floor indeed for
> petitioners seeking to establish exhaustion.  However, we agree with the district court
> that this language must be "applied with common sense and in light of the purpose
> underlying the exhaustion requirement[:] 'to afford the state courts a meaningful
> opportunity to consider allegations of legal error without interference from the
> federal judiciary.'"McNair [v. Campbell], 315 F. Supp. 2d at 1184 (quoting Vasquez
> v. Hillery, 474 U.S. 254, 257, 106 S. Ct. 617, 620, 88 L. Ed. 2d 598 (1986)).  This
> is consistent with settled law established by the Supreme Court. . . . We therefore
> hold that "'[t]he exhaustion doctrine requires a habeas applicant to do more than
> scatter some makeshift needles in the haystack of the state court record.'"

416 F.3d at 1302–03 (citations omitted).[5]

An issue that was not properly presented to the state court and which can no longer be

litigated under state procedural rules is considered procedurally defaulted, i.e., procedurally barred

from federal review.  Bailey v. Nagle, 172 F.3d 1299, 1302–03 (11th Cir. 1999).  This court will also

consider a claim procedurally defaulted if it was presented in state court and rejected on the

independent and adequate state ground of procedural bar or default.  See Coleman v. Thompson, 501

U.S. 722, 734–35 & n.1, 111 S. Ct. 2546, 2555 & n.1, 115 L. Ed. 2d 640 (1991); Caniff v. Moore,

---

[5]In his initial brief before the Court of Criminal Appeals, the petitioner cited one federal case in a string citation
containing other state cases, and in a closing paragraph in his argument that extraneous materials were considered by
the jury during deliberations, stated that there was a violation of his rights "protected by the Fifth, Sixth, Eighth[,] and
Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law."  McNair v.
Campbell, 416 F.3d 1291, 1303 (11th Cir. 2005).  The court found that these references to federal law were not sufficient
to meet the fair presentment requirement and noted that it was important that the petitioner had never mentioned the
federal standards regarding extraneous materials in his brief, but relied on state law for his arguments.  Id.

269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); Chambers v. Thompson, 150 F.3d 1324, 1326–27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord* Tower v. Phillips, 7 F.3d 206, 210 (11th Cir. 1993); Parker v. Dugger, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991).  In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine.  Bailey, 172 F.3d at 1303.  In the second instance, a federal court must determine whether the last state court rendering judgment clearly and expressly stated its judgment rested on a procedural bar.  *Id.*  A federal court is not required to honor a state's procedural default ruling unless that ruling rests on adequate state grounds independent of the federal question.  *See* Harris v. Reed, 489 U.S. 255, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989).  The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question.  Lee v. Kemna, 534 U.S. 362, 122 S. Ct. 877, 885, 151 L. Ed. 2d 820 (2002).  The Eleventh Circuit has set forth a three-part test to determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision.  Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001).  First, the last state court rendering judgment must clearly and expressly state it is relying on state procedural rules to resolve the federal claim.[6]  *Id.*  Second, the state court's decision on the procedural issue must rest entirely on state law grounds and not be intertwined with an interpretation of federal law.  Third, the state procedural rule must be adequate.  *Id.*  The adequacy requirement has been interpreted to mean the rule must be firmly established and regularly followed, that is, not applied in an arbitrary or unprecedented fashion.  *Id.*

A petitioner can overcome a procedural default in two narrow circumstances.  The petitioner must either show cause and prejudice or a fundamental miscarriage of justice in order for the federal habeas court to reach the merits of a claim.  Henderson v. Haley, 353 F.3d 880, 892 (11th Cir. 2003); Tower, 7 F.3d at 210; Parker, 876 F.2d 1470.  "For cause to exist, an external impediment, whether

---

[6]The federal court should honor the procedural bar even if the state court alternatively reviewed the claim on the merits.  Marek v. Singletary, 62 F.3d 1295, 1301–02 (11th Cir. 1995); Alderman v. Zant, 22 F.3d 1541, 1549 (11th Cir. 1994).

it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim." McCleskey v. Zant, 499 U.S. 467, 497, 111 S. Ct. 1454, 1472, 113 L. Ed. 2d 517 (1991) (quoting Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L. Ed. 2d 397 (1986)). Lack of counsel or ignorance of available procedures is not enough to establish cause. Tower, 7 F.3d at 210. Furthermore, the Eleventh Circuit has held that because there is no constitutional right to an attorney in state postconviction proceedings, any ineffectiveness of postconviction counsel cannot be "considered cause for the purposes of excusing . . . procedural default that occur[s] . . . at the state collateral post-conviction level." Henderson, 353 F.3d 892 (citing 28. U.S.C. § 2254(i); Coleman, 501 U.S. at 752; In re Magwood, 113 F.3d 1544, 1551 (11th Cir. 1997); Johnson v. Singletary, 938 F.2d 1166, 1174–75 (11th Cir. 1991)). To establish prejudice, a petitioner must show that there is "at least a reasonable probability that the result of the proceeding would have been different." Id.

Alternatively, to satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Schlup v. Delo, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him." Schlup, 513 U.S. at 327. Further,

> [A] substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial.

Id.

IV.    TRIAL EVIDENCE

A summary of the trial evidence adduced at Petitioner's trial provides a helpful context in reviewing Petitioner's claims. Officer Glenn King was the first witness to testify. He testified that at approximately 1:46 a.m. on July 25, 1994, he responded to a dispatch concerning shots fired at 740 Gwen Street (Doc. 18, Ex. C at 39–40). He observed a deceased individual lying on the ground with "massive" bleeding from the head and mouth (id. at 40–41). Officer King made contact with

Mary Johnson, who appeared frightened and hesitant to talk to him, and Ms. Johnson provided him a name that she believed she heard uttered that night (*id.* at 41–43).

Mary Johnson testified that in the early morning hours of July 25, 1994, she contacted the police regarding an occurrence outside her house (*id.* at 47). The audiotape of Ms. Johnson's call to 911 was published to the jury (*id.* at 48–51). In the audiotape, Ms. Johnson told the 911 operator that someone had been shot near her house (*id.* at 49). She stated that a car drove by, someone started running, and she heard a loud shot (*id.* at 50). She stated someone ran right outside her house, and the person that was shot was lying in her yard (*id.*). Ms. Johnson told the operator that she heard a boy pleading, "No, Jerry, please," then she heard running and a shot (*id.* at 51). After the tape was published, Ms. Johnson testified that she was unsure of the name uttered by the person, but she definitely heard someone pleading for his life (*id.* at 52–53, 55).

Marvin Tub, a forensic specialist with the Tallahassee Police Department, testified that he observed the crime scene and saw a trail of blood drops and spatter approximately 68 feet in length leading to the victim's body between houses at 740 and 742 Gwen Street (*id.* at 62–72, 79). Mr. Tub testified that the victim was shot once in the back, with the bullet entering just to the left of the center of the spine below the shoulder blade (*id.* at 72). He further testified that he and other officers searched the scene for cartridge or shell casings, but were unable to locate any (*id.* at 72–73).

Dr. Thomas Wood, a medical examiner, testified that he performed an autopsy on the victim, Derrick McKinney (*id.* at 82). He testified that during his examination, he observed a gunshot wound from the victim's back through his chest (*id.* at 84, 94–99). He further testified that the victim was shot from a range of 10 to 30 feet (*id.* at 104–05). Dr. Wood also testified that he observed a laceration on the front of the victim's left lower leg, which was consistent with the victim's falling forward to his knees (*id.* at 88). Dr. Wood testified that he observed injuries to the right side of the victim's face that showed a great deal of trauma, which was indicative of the victim receiving more than one blow to the head from an object, possibly a pistol (*id.* at 89–93). He testified that the injuries indicated that the victim received the blows to the head prior to being shot (*id.* at 90–92, 107–08). Dr. Wood further testified that he did not observe anything on the knuckles of the victim to indicate he was trying to hit anyone (*id.* at 100). Additionally, Dr. Wood testified that testing of the victim's blood and urine indicated that he was both under the influence of cocaine

when he was shot and had been under the influence of cocaine for "quite some time" prior to being shot (*id.* at 101–02). The tests did not detect any marijuana in his system (*id.* at 106).

The next witness was the victim's sister, Rochelle Tilman. She testified that she saw her brother, Derrick McKinney, later in the evening on July 24, 1994 (*id.* at 110–11). Ms. Tilman testified that he left her residence with two men, Kenneth L. Jackson and Eddie Powell, also known as "Lo" and "Night," respectively, to buy drugs (*id.* at 112–14). The three men returned to her residence without any drugs and then left again (*id.* at 128). Mr. McKinney returned to her residence approximately 45 minutes later with crack cocaine in his hand (*id.* at 129, 133–34). He mashed the cocaine, laced a cigarette with it, and smoked the cigarette (*id.* at 134). Ms. Tilman testified that McKinney appeared to be nervous and frightened, and he indicated that he expected someone to come to the residence (*id.* at 129). McKinney left her residence approximately 10 to 15 minutes later, and Ms. Tilman followed him outside (*id.* at 130, 135). Ms. Tilman testified that she saw Petitioner, also known as "Andre," "Miami Dre" or "Dre," drive into the neighborhood and stop at "Neesy's" house (*id.* at 130–31). She saw Petitioner and three other men enter Neesy's house, then the men and Neesy left the house and got back into the car (*id.* at 131). Ms. Tilman testified that she expected Petitioner to come to her house that night, and after Petitioner left Neesy's house, he came to her (Ms. Tilman's) house (*id.*). Neesy asked Ms. Tilman where Derrick was, but Ms. Tilman did not tell her (*id.* at 131–32). Later that night, Ms. Tilman saw Derrick in the same car with Petitioner, the three other men, and Neesy (*id.* at 132). The car passed in front of her, and she saw Petitioner in the front passenger seat of the car (*id.* at 136). The next time she saw her brother was at his funeral (*id.*).

Shalonda Stevens, also known as Neesy, testified that Petitioner came to her house on the evening of July 24, 1994 (*id.* at 140). Prior to coming to her house, he told her on the telephone that he was looking for Derrick McKinney (*id.* at 141). When Petitioner arrived at her house, he told her that someone took money from him (*id.*). Ms. Stevens testified that she told Petitioner that Derrick told her to tell him that he (McKinney) "didn't have anything to do with it," that it was someone named Carl and Night, and he (McKinney) would show him (Petitioner) where Carl and Night lived (*id.*). Ms. Stevens testified that she got into the back of a car driven by another man; Petitioner sat in the front passenger seat; and another man sat in the back seat behind the driver (*id.* at 142). She

testified that they drove to Derrick's sister's house and asked people standing in the yard if Derrick was there, and the people responded that Derrick had walked up the street (*id.*).  She then saw Derrick walking toward the car, and he got into the back seat with her behind Petitioner (*id.* at 143–44).  Ms. Stevens testified that Derrick told Petitioner he would show him where "them F-niggers" live (*id.* at 144).  They then drove to Chris Owens's  house, also known as "CO," who was Ms. Stevens's mother's boyfriend (*id.* at 149).  Petitioner, Derrick, and the two men left the car and talked to Mr. Owens (*id.* at 151, 156).  Petitioner, Derrick, and the two unidentified men got back into the car (*id.*).  Mr. Owens told Ms. Stevens he would take her home, so she left the car (*id.* at 156).  Ms. Stevens testified that she never saw Derrick McKinney alive after that (*id.*).  She testified that the next morning, she telephoned Petitioner and asked what happened to Derrick, and he responded that nothing happened (*id.*).  She talked to Petitioner again after she was questioned by police, and he told her that Derrick took him and the other two men to an empty apartment and they "beat his ass" and left him there (*id.* at 157).  On cross-examination, Ms. Stevens testified that she never saw a gun or drugs in the car, nor did she see anyone using drugs or drinking alcohol (*id.* at 160–61).

Tori Skipper testified that Derrick McKinney was her boyfriend in July of 1994, and they lived together (*id.* at 164–65).  She testified that Derrick's sister, Ms. Tilman, also lived with them at the time (*id.* at 172).  Ms. Skipper testified that Derrick was at home all day, but he left with other people that evening, and when he returned he was "kind of shook up" (*id.* at 165).  Derrick told her that "Lo" and "Night" had robbed Petitioner, but he did not know they were going to rob him (*id.* at 174).  Derrick also told Ms. Skipper that he expected Petitioner to come to the house looking for him (*id.*).  Ms. Skipper testified that later that evening, Petitioner, a man named Corry Evans, and two other men came to her house looking for Derrick (*id.* at 165–66).  The men and Shalonda Stevens sat in the car in front of Ms. Skipper's house waiting for Derrick (*id.* at 166–67).  Ms. Skipper saw Shalonda point up the street, and the men drove up the street (*id.* at 167).  She saw Derrick get in the car, and the car drove past her (*id.*).  Ms. Skipper testified that this occurred between 10:00 p.m. and midnight (*id.* at 169).  She stated she did not seek Derrick again (*id.*).  Ms. Skipper testified that she telephoned Petitioner the next day, and Petitioner told her they dropped off Derrick at a store (*id.* at 167–68).

Anthony Williams testified next.  He testified that in 1994, he knew Petitioner, Coy Evans, and Tracy "Gus" Battles (*id.* at 179).  Mr. Williams testified that he saw Petitioner on the night of July 24, 1994, walking away from a motel (*id.*).  Williams stated Petitioner was "ranting and raving" about having just been robbed, and Petitioner had been hit in the head (*id.*).  Williams stated Petitioner did not know who robbed him, but he believed Derrick McKinney could identify them because the men were with Derrick (*id.* at 179–80).  Later that evening, Williams met Petitioner, Coy Evans, and Gus Battles, and they went to a trailer park looking for Derrick (*id.* at 180–81).  Mr. Williams testified that he did not recall that any girls were in the car that night (*id.* at 181).  Williams stated they found Derrick, and Derrick said he would show Petitioner where the men were (*id.*).  Williams stated Coy and Petitioner sat in the front seat, Derrick got in the back seat behind the driver, Williams sat in the middle of the back seat, and Gus sat on the other side of him (*id.* at 198).  Williams testified that Derrick directed them to an apartment complex, but the apartment was empty (*id.* at 182).  They then drove to Alabama Street, stood outside the car for awhile, and left for Gwen Street (*id.* at 182–83).  Upon arriving at Gwen Street, Williams sat in the car with the door open (*id.* at 183).  Coy and Gus were standing outside near the other side of the car as Williams, and Petitioner and Derrick were at the rear of the car (*id.* at 183–84).  While Williams was sitting in the car, he felt a bump, which he believed was from Petitioner and Derrick wrestling (*id.* at 184).  Approximately 10 to 15 seconds later, Williams saw Derrick running away from the car with Petitioner following him (*id.* at 184–85).  No one else followed the two men (*id.* at 185).  Williams testified that he saw Derrick and Petitioner run between two houses, with Petitioner approximately 5 feet behind Derrick (*id.* at 186).  After the men ran around a tree, Williams heard one gunshot (*id.*).  Williams testified that Petitioner then ran back to the car, and Williams saw a gun in Petitioner's hand (*id.* at 187).  Williams stated that Coy and Gus began screaming at Petitioner (*id.* at 188).  They drove off, and Williams was dropped of at Alabama Street (*id.*).  Williams testified that the police questioned him about the shooting, but he did not tell them anything because he wanted to protect himself—he was scared that he might be in trouble for being at the scene, and he was scared about what might happen to him if he told the police what happened (*id.* at 189).  Williams admitted that in 1997 and 2000, he was convicted of offenses unrelated to the shooting, namely, possession of cocaine and burglary

(*id.* at 189, 202).  He stated he was released from prison in May of 2001, got married, got a job, and has stayed out of trouble (*id.* at 190).

On cross-examination, Mr. Williams testified that in 1994, he used marijuana, cocaine, and alcohol on a daily basis (*id.* at 193–94).  He also admitted that everyone in the car began smoking marijuana after they picked up Derrick at approximately 10:00 p.m., and they continued smoking for a couple of hours (*id.* at 194–98).  Williams stated he used cocaine after he was dropped off on Alabama Street (*id.* at 200).

Employing the same procedure he had used with other witnesses, the trial judge asked the jury if they had any questions for Mr. Williams (*id.* at 207).  At a sidebar conference, the judge informed counsel that one of the questions was, "Did he come forward on his own accord when he got was [sic] released?" (*id.* at 207).  The judge asked counsel if they objected to Mr. Williams answering the question (*id.* at 208).  Defense counsel responded that he had no objection (*id.*).  The prosecutor stated the following:

> I don't have an objection.  But I would give you a cautionary.  That it may well trigger a response as to what that tells them Coy Evans told him.  That's the way they found out about it.  That's the way they found out from Coy Evans.  And if you ask him that question that way, he may well tell you what the police told him about what they say Coy told them.  Coy Evans is ultimately the one who ultimately put him [Williams] as being in the car.

(*id.*).  The trial judge commented that if that information was revealed, it would be prejudicial (*id.*).  The judge and counsel decided that the judge would ask Williams how he came to be a witness (*id.* at 208–09).  The testimony proceeded as follows:

> THE COURT:  Mr. Williams, just one final question from the jury.  How did you come to be a witness?
>
> THE WITNESS:  How did I come to be a witness?
>
> THE COURT:  Yes, sir.
>
> THE WITNESS:  Coy Evans implicated me in this.
>
> THE COURT:  I'm sorry.  Are you finished with your answer?  And according to whom?

THE WITNESS:  The police.

THE COURT:  Did the police come to you, is that what you're saying?

THE WITNESS:  After Coy Evans told them, then he told them what happened, and I was the next on the list and that's how they came to me.

(*id.* at 209).

Defense counsel then questioned Mr. Williams as follows:

Q.  They came to you after Coy Evans was arrested in connection with the homicide of a police officer?

A.  Yes, sir.

Q.  And did they tell you that Coy Evans said you were there that night that things—

A.  What they said is—they began to do is recollecting (sic) everything that went on that night.

Q.  And is that when you told them you had, in fact, been there with Coy and Gus, and Dre?

A.  We not to—no sence [sic] in me lying anymore.

Q.  So the police came to you, said—they told you what their version was and you agreed?

A.  No.  They came to me and they asked me—they talked to me.  They took me outside and they began to ask me about Derrick.  And then they began to—and I was saying no, no, no.  And they began like, yes, this is what—this is this, and this is that.  So, they already knew what went on anyway because it was already told to through [sic] Coy Evans.  He already laid it out, basically, so why for me [sic] to keep saying no.

Q.  So you didn't come to the police, the police came to you?

A.  That's the one who came to me.

Q.  Did you talk to Coy Evans?

A.  No, I never talked to Coy Evans.

Case No. 4:06cv554/MMP/EMT

Q.  What did Coy Evans said [sic] or did say—

A.  No.

Q.  Isn't it true—and again, you denied you knew anything about this case when the police pulled you outside, isn't that true?

A.  Yes.

Q.  That's all.

THE COURT: Any redirect?

BY MR. WADE:

Q.  And then you said to yourself why not go ahead and tell it, it's already told?

A.  It's already there.  There's no sense in going through this, going through the motions when they, you know, they already knew.

(*id.* at 209–11).

The last witness for the prosecution was Sergeant Mark Ormerod.  He testified that he interviewed Shalonda Stevens (Neesy) after the murder.  Sergeant Ormerod read a redacted version of the transcript of his interview with Ms. Stevens, which included statements by Ms. Stevens that were inconsistent with her trial testimony (*id.* at 242–43).  During the interview, Ms. Stevens stated that Petitioner suspected Derrick of setting him up to be robbed (*id.* at 242–43).  Ms. Stevens also stated that after Derrick got into the car, Petitioner questioned him about the fact that he (Derrick) was present when Petitioner was robbed, but he (Derrick) claimed to have no involvement in the robbery (*id.* at 242, 245).  Ms. Stevens said Derrick responded that he had nothing to do with the robbery, and if he did, he would tell Petitioner (*id.*).  Ms. Stevens told Sergeant Ormerod that she asked Derrick, in Petitioner's presence, how the robbers knew that Petitioner had money if he (Derrick) did not tell them (*id.* at 243).  During her trial testimony, Ms. Steven denied that she made these statements during her interview (*id.* at 143–48, 151–55).

The defense did not present any evidence (*id.* at 248–52).

V.     PETITIONER'S CLAIMS

A.    Ground One: "Counsel ineffective in failure to object to hearsay testimony of State witness."

Petitioner contends he received ineffective assistance of counsel because defense counsel failed to object to Anthony Williams's testimony that Coy Evans told police about the shooting, including Williams's presence at the scene (Doc. 9 at 4; Doc. 10 at 3–9).  Petitioner contends that under state law, an out-of-court statement explaining an investigating officer's motive for investigating the defendant and relating accusatory information is inadmissible, even when offered for the purpose of explaining the logical sequence of events leading up to an investigation and arrest, because any probative value is outweighed by the prejudicial effect of such testimony (Doc. 10 at 3) (citing State v. Baird, 572 So. 2d 904 (Fla. 1990)).

In his supporting memorandum, Petitioner argues that Mr. Williams's non-hearsay testimony was unreliable (see Doc. 10 at 4–5).  For example, Williams's testimony that Derrick McKinney was smoking marijuana on the night he was killed was contradicted by the medical examiner's testimony that blood tests showed no presence of marijuana in McKinney's system (see Doc. 10 at 4).  Additionally, there was no evidence corroborating Williams's testimony (id. at 5).  Petitioner argues that the hearsay testimony, that is, that Coy Evans described the events of that night to police and stated that Williams was present, had the effect of corroborating and bolstering Williams's version of the events that night (id. at 5, 7).  Yet Petitioner also argues that the hearsay testimony suggested that the police forced Williams to agree with Coy Evans's description and testify to such (id.), which supports an argument that the hearsay testimony was favorable to Petitioner because it suggested that police coerced Williams to testify as he did.  Petitioner contends defense counsel should have objected to the hearsay testimony on the additional ground that its admission violated the Confrontation Clause because Petitioner did not have an opportunity to cross-examine Coy Evans, and the hearsay evidence had a substantial and injurious effect and influence on the verdict (id. at 8–9).  Finally, Petitioner argues that during the evidentiary hearing on his Rule 3.850 motion, defense counsel admitted he performed deficiently by failing to object to the hearsay statements and request a mistrial (id. at 7, 9).

Respondent concedes that Petitioner exhausted this claim by presenting it in his Rule 3.850 motion and appealing the trial court's denial of this claim (Doc. 18 at 14).  Respondent contends the

state court evaluated the claim under the standard set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984) and determined that neither prong of the <u>Strickland</u> standard was met (*id.*). Respondent further contends the state court's adjudication of the claim was not contrary to or an unreasonable application of <u>Strickland</u> (*id.* at 14–26).

    1.      Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To obtain relief under <u>Strickland</u>, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. 466 U.S. at 687–88. If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. *Id.* at 697. Thus, this court need not address the prejudice prong if the court determines that the performance prong is not satisfied. <u>Turner v. Crosby</u>, 339 F.3d 1247, 1279 (11th Cir. 2003); <u>Holladay v. Haley</u>, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa.") (citation omitted).

"The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." <u>Jones v. Campbell</u>, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing <u>Chandler v. United States</u>, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)). The focus of inquiry under the performance prong is "reasonableness under prevailing professional norms." <u>Strickland</u>, 466 U.S. at 688–89. "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do." <u>Jones</u>, 436 F.3d at 1293 (citing <u>Chandler</u>, 218 F.3d at 1314–15 n.15). Furthermore, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would

have done so." <u>Rogers v. Zant</u>, 13 F.3d 384, 386 (11th Cir. 1994).  Counsel's performance is deficient only if it is "outside the wide range of professional competence."  <u>Jones</u>, 436 F.3d at 1293 (citing <u>Strickland</u>, 466 U.S. at 690); <u>Lancaster v. Newsome</u>, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation").

As to the prejudice prong of the <u>Strickland</u>, the Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'"  <u>Strickland</u>, 466 U.S. at 693.  However, the Court has also clarified that a petitioner need not demonstrate it 'more likely than not, or prove by a preponderance of evidence,' that counsel's errors affected the outcome.  <u>Strickland</u>, 466 U.S. at 693–94.  Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

<u>Id.</u> at 694.  The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. <u>Strickland</u>, 466 U.S. at 694–95.  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  <u>Id.</u> at 695.

2.      Federal Review of State Court Decision

Petitioner raised this claim as Ground One in his Rule 3.850 motion (Doc. 28, Ex. K at 4–9). In the trial court's written opinion denying Petitioner's motion, the judge relied upon the reasons stated on the record at the evidentiary hearing as the basis for his decision (Doc. 18, Ex. K at 146). As indicated in the transcript of the postconviction evidentiary hearing, the parties and the trial judge agreed that <u>Strickland</u> set forth the controlling legal standard applicable to Petitioner's claim of ineffective assistance of counsel (Doc. 18, Ex. K at K at 36–50).  However, it is apparent from the trial judge's comments that he interpreted the <u>Strickland</u> standard as requiring Petitioner to show that defense counsel's performance was "unreasonably deficient," and the error "likely [ ] affected the verdict" (<u>id.</u> at 41, 49–50).  The state court's phrasing of both prongs of the <u>Strickland</u> standard was not technically accurate as the performance component requires a petitioner to show that counsel's performance was simply deficient, not unreasonably deficient, and the prejudice

component requires a petitioner to show a reasonable probability, not a likelihood, of a different result. *See* Strickland, 466 U.S. at 693–94 (a petitioner need not demonstrate it "more likely than not" that counsel's errors affected the outcome). Even assuming that the state court's misstatement of the Strickland standard takes this case outside the deferential scope of review set forth in section 2254(d)(1), the undersigned reaches the same result as the state court on the issue of whether Petitioner received ineffective assistance of counsel. *See* Purvis v. Crosby, 451 F.3d 734, 738 (11th Cir. 2006) (denying habeas relief on claim of ineffective assistance of counsel after reaching same result as state court even without affording deference to state court decision where most efficient way to decide claim was to "assume away" subsidiary issues, including that counsel's failure to object to partial closing of courtroom was deficient performance, and state court's phrasing of prejudice test as whether there was "a reasonable likelihood" that counsel's error "impacted the outcome of the trial" took case outside scope of section 2254(d)(1) and, therefore, state court decision was not entitled to deference).

At the evidentiary hearing on Petitioner's Rule 3.850 motion, Clyde Taylor, Petitioner's defense counsel during trial, testified extensively regarding this ineffective assistance claim. Mr. Taylor testified that he had been practicing in the area of criminal defense since 1978, and he tried nine to twelve first degree murder cases during that time (Doc. 18, Ex. K at 5). He stated that Anthony Williams was the "one absolutely critical witness" for the State because Williams was the only witness who could place Petitioner at the scene at the time of the shooting (*id.* at 6–7). Mr. Taylor testified that the State disclosed Coy Evans as a potential witness, but early in the case the State advised that they did not intend to call him as a trial witness, and he (Taylor) had "absolutely no intention of deposing or otherwise re-interesting the State in bringing Mr. Evans to the courtroom" (*id.* at 7). Mr. Taylor testified that his strategy was to discredit Mr. Williams, for example by highlighting to the jury that Williams's testimony that everyone including Derrick McKinney was smoking marijuana in the car was contradicted by the medical examiner's testimony that marijuana was not found in McKinney's system, and then argue to the jury during closing arguments that Williams was either lying about being at the scene or lying as to what he saw (*id.* at 13–15). Mr. Taylor further testified that he seriously contemplated attempting to "point the finger" at Coy Evans, but was relieved that the State decided not to call Evans as a witness, because his

strategy of cross-examining Anthony Williams would have been compromised if another witness, for example, Coy Evans, had corroborated Williams's story concerning the events on the night of the shooting (*id.* at 15–16). When asked the reason he did not interpose an objection when Anthony Williams testified, "After Coy Evans told them, then he told them what happened and I was the next on the list and that's how they came to me," Mr. Taylor responded he was caught off guard and thought he could minimize any damage by "jumping up and asking a couple of questions" (*id.* at 22). When asked why he did not move for a mistrial, Mr. Taylor responded as follows:

> . . . my gut reaction there would be, we had all agreed to the question in the first place. I don't think we expected the answer. Probably the better response should have been move to strike. . . . reading it now and seeing it, the Court may very well have granted that, tell the jury to disregard it, and then I would have at least had to make another decision as to whether to ask any questions or follow up with other motions, but I didn't. Instead I tried to pretend like it wasn't any big deal and move right into questions.
>
> . . . .
>
> I wanted to minimize that particular aspect of the case. I still—again in hindsight, I still—when you get caught unexpectedly with something in a trial, . . . you want to try to minimize the damage as best you can and a lot of times you have to think on your feet and I do not recall thinking at any time mistrial or error. And I don't believe my trial notes reflect that.
>
> It is my practice that if—I take—sometimes I don't [take] as good notes as I ought to, but I always do a time line on the left. And if something significant comes up at 11:10 a.m. you will see an entry, 11:10 a.m., Error, and a big exclamation point. Then when [I] got a chance to write out what it is to the right side of the page it will be there. And oftentimes I go back and say, You know, Judge, I may be [sic] should have moved, you know, three minutes ago, but I'm doing it and then I try to reconstruct and point to a time, which give[s] you some credibility. And I don't see that in this particular case. So all I could tell you is I didn't see it.
>
> Q. You missed it?
>
> A. Correct. And tried to make good out of it by following up with the questions.

(*id.* at 22–24). Mr. Taylor acknowledged that his decision to further question Williams backfired, and in hindsight, he would have objected to the line of questioning regarding how Williams became a trial witness (*id.* at 24–26). Mr. Taylor explained:

It was my belief that the whole intent of everybody, starting with the Court, followed by Mr. Wade and I agreeing, was to try to minimize a potential problem with the gratuitous statements by Williams. It failed. And when you have got seconds to make a decision that, yeah, in hindsight I would have done it differently now.

. . . .

I simply did not catch it at the time as being as significant as maybe it is when you put it under a microscope and you look at it closer at the time. I felt that, again—and it may have been I was too focused on the issue of—you know, I knew we had evidence—excuse me, I knew we had Williams on his tail about the marijuana. And there is no question that's where we were . . . focusing.

(*id.* at 26–27).

On cross-examination by the State, Mr. Taylor testified that he did not perceive the situation as so damaging to warrant a mistrial, especially since the situation provided an opportunity to further impeach Williams's credibility by focusing on the fact that he lied to the police by first telling them he knew nothing about the murder and then telling them he was present (*id.* at 30). Taylor further testified that if he had perceived Mr. Williams's testimony as creating grounds for a mistrial, he would not have hesitated to make a motion for mistrial, but he "just didn't see it that way" at the time (*id.*). He stated:

Even though I agree, that a number of people could say that was a mistake and it may very well have been, it did not in any way change the general theory of defense or the focus of the defense in the trial. It didn't generate a situation where I had to go to the client and say you have now got to testify, that I had to come to the prosecutor and say, you know, this was a mess. You know, you don't get Evans in there. Judge, I need a continuance. . . . I didn't see it as a mistrial. I just did not see it.

(*id.* at 31). Mr. Taylor conceded that the fact that the jury had previously heard testimony that Coy Evans was in the car on the night of the shooting rendered Williams's hearsay testimony more damaging (*id.* at 35). On re-direct, Mr. Taylor testified that his failure to object to the hearsay testimony was not a strategic decision (*id.*).

Assuming arguendo that Anthony Williams's testimony that Coy Evans implicated him and told the police what happened on the night of Derrick McKinney's murder was inadmissible hearsay, defense counsel's attempt to minimize any damaging effect of the testimony and use it to benefit the defense, instead of moving to strike the testimony or for a mistrial, was not unreasonable. Initially, the hearsay statements did not directly incriminate Petitioner, they merely suggested that Coy Evans

told police the same version of events to which Anthony Williams testified. Additionally, the statements were quite helpful in discrediting Williams's testimony. The State's case rested on the testimony of Anthony Williams because he was the only witness who placed Petitioner at the scene of the shooting, chasing the victim between two houses immediately prior to the shooting, and returning to the car immediately after the shooting with a gun in his hand and without the victim. Therefore, the focus of the defense was discrediting Williams's testimony. Prior to introduction of the hearsay testimony at issue, defense counsel elicited only two areas of testimony from Williams that were helpful in discrediting him. First, the defense elicited testimony from Williams that everyone in the car, including the victim, was smoking marijuana in the car for approximately two hours prior to the shooting. This testimony was contradicted by the medical examiner's testimony that medical testing revealed no evidence of marijuana in the victim's system. Second, the defense elicited testimony from Williams that he was a drug dealer at the time of the shooting and had been convicted of two felonies since the shooting.

Upon introduction of Williams's testimony that Coy Evans led the police to him and provided a version of the events to police, defense counsel elicited three additional areas of testimony on cross-examination that discredited Williams. First, Williams admitted on cross-examination that when police interviewed him, he told police two contradictory stories regarding the night of the shooting. He first told police that he knew nothing about Derrick McKinney's shooting, but within minutes provided significant details about that night. Second, Williams testified that he did not volunteer the information to police; rather, he gave information to police only after Coy Evans advised police that he (Williams) was present, and the police pressured him to talk, at which time he agreed with the story told to him by police. Third, defense counsel elicited testimony that the police came to Williams, based upon information from Evans, only after Evans was arrested for killing a police officer; in other words, Evans decided to provide information about the McKinney murder only after being arrested for an egregious crime.

Furthermore, defense counsel used the information obtained through the hearsay testimony during closing argument to argue that Williams's testimony was unreliable and not credible (*see* Doc. 18, Ex. C at 275–81, 294–98). Counsel argued that Williams's testimony was motivated by pressure from police. He argued that upon Coy Evans's informing the police that Williams was

present after Evans's arrest for murdering a police officer, Williams simply went along with the story that police fed him. Defense counsel also argued that Williams's testimony that everyone in the car had been smoking marijuana for hours prior to the shooting was inconsistent with the medical evidence that the victim had no marijuana in his system. Defense counsel also used Williams's hearsay testimony to argue the weakness of the State's case by arguing that Coy Evans was in jail for killing a police officer and was thus available to testify, but the State failed to call Evans as a witness to corroborate Williams's story. Given that Williams's testimony was most crucial to the State's case, and correspondingly, most damaging to Petitioner, it would not be unreasonable for defense counsel to conclude that five areas of impeachment were better than two.

Although hindsight may reveal counsel was wrong in his assessment of the value of the hearsay testimony to the prosecution or wrong in his assessment of its impeachment value to the defense, judicial scrutiny of counsel's performance must be "highly deferential," and this court should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. Evaluating defense counsel's conduct from counsel's perspective at the time, as evidenced by counsel's testimony during the evidentiary hearing, this court cannot conclude that counsel's failure to make a motion to strike the hearsay testimony or for a mistrial was a decision that no competent counsel would have made. In light of Petitioner's failure to satisfy the deficient performance prong of the Strickland standard, the court need not analyze the prejudice prong. *See* Strickland, 466 U.S. at 697.

     B.    Ground Two: "Counsel ineffective in not moving to strike hearsay testimony [of Rochelle Tilman]."

          Ground Three: "Counsel ineffective in not filing a motion in limine prior to trial."

          Ground Four: "Counsel ineffective in not properly filing a motion for judgment of acquittal."

          Ground Five: "Counsel ineffective in failing to object to the State's closing arguments."

          Ground Six: "Counsel ineffective for not objecting to the impeachment of Shalonda Stevens."

Ground Seven: "Counsel was ineffective where he failed to deposition [sic] the State's witness."

Ground Eight: "Fundamental error where trial court fails to grant a judgment of acquittal."

Petitioner contends he raised all of these claims in his Rule 3.850 motion (*see* Doc. 9 at 4, 5, 5a, 5b). Respondent contends that although Petitioner raised each of these federal claims in his Rule 3.850 motion, Petitioner's postconviction counsel expressly waived Grounds Two through Six and Ground Eight at the evidentiary hearing. Additionally, none of these grounds was raised on appeal of the trial court's denial of the Rule 3.850 motion. Therefore, Petitioner failed to fairly present Ground Two through Eight to the state courts (*see* Doc. 18 at 6–7). Respondent further contends that Petitioner has no other method for raising these claims in state court as he cannot return to state court to exhaust claims that could have and should have been raised and resolved in his first postconviction proceeding (*id.* at 8). Therefore, the claims are procedurally barred from federal review (*id.*). In Petitioner's reply brief, he first contends that he fairly presented all of his postconviction claims because each of his claims was grounded on ineffective assistance of counsel, which was the substantive issue that his postconviction counsel raised in the postconviction appeal (*see* Doc. 25 at 1–2). Alternatively, Petitioner asserts the procedural default was caused by his postconviction counsel's inexplicable failure to preserve his rights by arguing the claims at the evidentiary hearing and on appeal (*id.* at 3).

Review of the state court record confirms that Petitioner raised Grounds Two through Eight in his Rule 3.850 motion (*see* Doc. 18, Ex. J at 88–115). At the evidentiary hearing on Petitioner's postconviction motion, Petitioner's counsel stated that he intended to proceed only on Grounds One and Seven, that is Petitioner's claims that he received ineffective assistance of counsel based upon counsel's failure to object to hearsay testimony by Anthony Williams and move for a mistrial based upon that testimony, and counsel's failure to depose the State's witnesses (Doc. 18, Ex. K at 3–4). Counsel stated Petitioner was waiving his other claims (*id.* at 4). During the evidentiary hearing, Petitioner's postconviction counsel presented evidence and argument only on Grounds One and Seven (*id.* at 5–46). In Petitioner's brief on appeal of the trial court's denial of the Rule 3.850

motion, Petitioner's counsel argued only that the trial court erred in its denial of Ground One (Doc. 18, Ex. L at 9–13).

Initially, the record conclusively establishes that Petitioner abandoned Grounds Two through Six and Ground Eight by expressly waiving them at the evidentiary hearing and failing to present any evidence or argument on those claims at the hearing. *See* <u>Reaves v. State</u>, 826 So. 2d 932, 942 (Fla. 2002) ("[W]here a defendant fails to pursue a claim . . . at the trial court, he waives such claim and cannot raise it on appeal with this Court."). Additionally, Petitioner failed to exhaust Grounds Two through Eight, including Ground Seven, by failing to raise them on appeal of the order denying his Rule 3.850 motion. Where, as here, Petitioner received an evidentiary hearing on all claims raised in his Rule 3.850 motion, he was required to file an appellate brief in appealing the trial court's denial of the motion. *See* Fla. R. App. P. 9.141(b)(3). Petitioner did file a brief, and his failure to address Grounds Two through Eight in his brief constituted a waiver of those issues in the state court. *See, e.g.,* <u>Sweet v. State</u>, 810 So. 2d 854, 870 (Fla. 2002) (holding that claims raised on appeal from order denying post-conviction relief were procedurally barred where petitioner received an evidentiary hearing on his Rule 3.850 motion, and failed to fully brief the claims on appeal); <u>Shere v. State</u>, 742 So. 2d 215, 224 n.6 (Fla. 1999) ("In a heading in his brief, Shere asserts that the trial court erred by summarily denying nineteen of the twenty-three claims raised in his 3.850 motion. However, for most of these claims, Shere did not present any argument or allege on what grounds the trial court erred in denying these claims. We find that these claims are insufficiently presented for review."); <u>Duest v. Dugger</u>, 555 So. 2d 849, 851 (Fla. 1990) (holding that issues raised on appeal from order denying post-conviction relief were procedurally barred where petitioner received an evidentiary hearing on his Rule 3.850 motion and failed to fully brief and argue the points on appeal; petitioner's merely making reference to arguments below without further elucidation did not suffice to preserve issues, and those claims were deemed to have been waived). Therefore, Grounds Two through Eight are procedurally defaulted. *See* <u>Atwater v. Crosby</u>, 451 F.3d 799, 810 (11th Cir. 2006) (holding that petitioner, who had received an evidentiary hearing on his Rule 3.850 motion, procedurally defaulted his right-to-testify claim when he failed to argue it in his initial brief on appeal from the denial order; raising it in his reply brief was not proper exhaustion); *see also* <u>Cortes v. Gladish</u>, 216 Fed. Appx. 897, 899–900 (11th Cir. 2007) (stating that had the

petitioner received an evidentiary hearing on his Rule 3.850 motion, his failure to address issues in his appellate brief would constitute a waiver of those issues, and they would be considered procedurally defaulted).

Finally, although Petitioner suggests that his Rule 3.850 counsel was constitutionally ineffective for waiving Grounds Two through Six and Ground Eight at the trial level, and his appellate counsel was ineffective for failing to raise Grounds Two through Eight on appeal, such a claim does not constitute cause. As previously discussed, the Supreme Court has held that "[t]here is no constitutional right to an attorney in state post-conviction proceedings," and "[c]onsequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings." Coleman, 501 U.S. at 753–54; see also Pennsylvania v. Finley, 481 U.S. 551, 555, 107 S. Ct. 1990, 95 L. Ed. 2d 539 (1987); Murray v. Giarratano, 492 U.S. 1, 109 S. Ct. 2765, 106 L. Ed. 2d 1 (1989). "A petitioner cannot establish constitutionally ineffective assistance of counsel in state post-conviction proceedings because there is no constitutional right to an attorney in such proceedings." Jimenez v. Sec'y Dep't of Corr., 481 F.3d 1337, 1344 (11th Cir. 2007); see also Mize v. Hall, 532 F.3d 1184, 1191 (11th Cir. 2009) ("Because a petitioner has no right to counsel during state collateral review, even grossly ineffective assistance at the collateral review stage, or no assistance at all, does not constitute cause to excuse a procedural default."). Consequently, Petitioner has not shown either cause or actual prejudice to excuse his default. Henderson v. Campbell, 353 F.3d 880, 892 (11th Cir. 2003). Furthermore, Petitioner has not shown that he is entitled to application of the fundamental miscarriage exception to the procedural bar. Therefore, Grounds Two through Eight are unexhausted in the state court and procedurally barred from federal review.

VI.     CONCLUSION

Petitioner failed to establish a meritorious claim of ineffective assistance of counsel as to Ground One, and his remaining claims are procedurally barred from federal review. Therefore, his amended habeas petition should be denied.

Accordingly, it is **ORDERED**:

The clerk of court is directed to change the docket to reflect that Walter McNeil is substituted for James McDonough as Respondent.

Case No. 4:06cv554/MMP/EMT

And it is respectfully **RECOMMENDED**:

That the amended petition for writ of habeas corpus (Doc. 9) be **DENIED**.

At Pensacola, Florida, this 27th day of August 2009.


/s/ Elizabeth M. Timothy
**ELIZABETH M.  TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

### NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations may be filed within ten (10) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**